IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| JACOBS CHUCK MANUFACTURING CO. | § | |
| Vs. | § | CIVIL ACTION NO. 2:05-CV-185 |
| SHANDONG WEIDA MACHINERY CO., LTD., & ONE WORLD TECHNOLOGIES, INC. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

**I.      Introduction**

Plaintiff Jacobs Chuck Manufacturing Company (hereinafter "Jacobs") sued Defendants

Shandong Weida Machinery Co., Ltd., (hereinafter "Weida") and One World Technologies, Inc.,

(hereinafter "One World") for allegedly infringing United States Patents Nos. 5,573,254

(hereinafter "the '254 patent") and 5,358,345 (hereinafter "the '345 patent").  The patents-in-suit

involve drill chucks and Jacobs alleges Weida manufactures and places infringing drill chucks

into the stream of commerce with the "reasonable expectation and/or knowledge that the actual

or potential ultimate purchasers and users of such chucks are located in Texas, as well as

elsewhere in the United States."  Plaintiff's Original Complaint at 2.  Weida moves this Court to

dismiss Jacobs' Complaint for lack of personal jurisdiction.  After reviewing the parties' briefs

and applicable case law, this Court DENIES Weida's motion.

## II.    Facts

Jacobs is a Delaware corporation with its principal place of business in Clemson, South Carolina. Jacobs is in the business of designing, developing, and marketing drill chucks, other precision tools, work holding devices for stationary equipment, and portable power tools.  In addition, Jacobs is the assignee of the '254 patent and licensee of the '345 patent.

Weida is a Chinese corporation with its principal place of business in Manshan Town, Wendeng, Shandong, China.  Weida is in the business of designing and manufacturing drill chucks for use in power tools.  Weida is the largest manufacturer of drill chucks in the world and it asserts its products are known for their "quality and reliability all over the world with customers spreading over 80 different countries and areas overseas."  Shandong Weida Machinery Co., Ltd., http://www.weidapeacock.com/engligh/about.htm (last visited Nov. 29, 2005).

Weida manufactures the allegedly infringing drill chucks at its facilities in China and sells them to Techtronic Industries Co., Ltd. (hereinafter "Techtronic"), a Hong Kong corporation whose principal place of business is in Hong Kong.  Techtronic, along with its wholly owned subsidiary One World,[1] designs and manufacturers the RIDGID brand power tools sold exclusively at Home Depot stores.[2]  Jacobs claims the RIDGID Model No. R7000 drill contains

---

[1]One World is a Delaware corporation with its principal place of business in Anderson, South Carolina.

[2]As part of Weida's commercial contract with Techtronic, Weida agreed not to sell the alleged infringing chuck in the United States, thus granting Techtronic an exclusive right to sell the chuck in the United States.

an infringing chuck manufactured by Weida.[3]

## III.    Discussion

### A.    Legal Standard

Whether personal jurisdiction exists over Weida depends of this Court's determination of whether jurisdiction lies under the Texas long-arm statute and the Due Process Clause of the United States Constitution.  The Texas long-arm statute[4] extends the reach of personal jurisdiction to the limits of the United States Constitution.  *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000).  Therefore, because Texas' long-arm statute is coextensive with the limits of due process[5], this Court need only consider whether sufficient contacts exist between Weida and the State of Texas to satisfy the "minimum contacts" requirements of *Int'l Shoe v. Wash.*, 326 U.S. 310, 316 (1945).  "[D]ue process requires only that

---

[3]Jacobs alleges its agent purchased a RIDGID R7000 drill at Home Depot Store # 6514 in Tyler, Texas on May 12, 2005.

[4]Tex. Civ. Prac. & Rem. Code Ann. § 17.042 states:

In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:

(1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

(2) commits a tort in whole or in part in this state; or

(3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

[5]The Court must examine due process in light of the Fifth Amendment rather than the Fourteenth Amendment because this patent infringement case arises under federal question jurisdiction.  *Akro Corp. v. Luker*, 45 F.3d 1541, 1544 (Fed. Cir. 1995).

in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* To establish "minimum contacts," the defendant must have "purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Contacts that are "random," "fortuitous," "attenuated," or "due to the unilateral activity of another party or a third person" are insufficient to confer jurisdiction. *Burger King. Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

Whether sufficient "minimum contacts" exist between Weida and the State of Texas may be described in terms of either specific jurisdiction or general jurisdiction. *Hunter v. Suzuki Motor Corp.*, No. 2:03-CV-128, 2003 WL 22149297, at *1 (E.D. Tex. Sept. 18, 2003). Specific jurisdiction involves situations in which the corporation has purposefully directed its activities at the forum State and the "litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472 (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). In contrast, general jurisdiction involves situations in which the nonresident defendant's contacts with the forum State, although not related to the plaintiff's cause of action, are so "continuous and systematic" that the forum may exercise personal jurisdiction over the defendant even if the suit is unrelated to the defendant's contacts with the forum. *Helicopters Nacionales de Colombia, S.A.*, 466 U.S. at 415-16.

In a patent infringement case, this Court must apply Federal Circuit law in determining whether personal jurisdiction may be exercised over an out-of-state defendant. *See Hildebrand v. Steck Mfg. Co.*, 279 F.3d 1351, 1354 (Fed. Cir. 2002). "When analyzing personal jurisdiction for

4

purposes of compliance with federal due process, Federal Circuit law applies." *LSI Indus., Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1371 (Fed. Cir. 2000).  With respect to procedural questions that are not unique to patent law, the law of the regional circuit applies.  *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1574-75 (Fed. Cir. 1984).

In determining personal jurisdiction, this Court must accept as true the uncontroverted allegations of the plaintiff's complaint.  *See Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed. Cir. 1995); *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1563 (Fed. Cir.), *cert. dismissed*, 512 U.S. 1273 (1994) ("Since they are uncontroverted, plaintiff's factual allegations are taken as true for purposes of determining jurisdiction in the Virginia district court.").  However, the Court's research has revealed no Federal Circuit case which addresses how the evidence is to be assessed and the burden of proof allocated when the allegations are controverted.  Thus, the Court will apply the Fifth Circuit's rule.  *See Taylor v. Ishida Co., Ltd.*, No. 3:02-CV-0402-D, 2002 WL 1268028, at *3 (N.D. Tex. May 31, 2002) (in patent infringement case, adopting Fifth Circuit's rule in the absence of Federal Circuit guidance).  Where, as here, the Court will decide the motion to dismiss without holding an evidentiary hearing, Jacobs must make only a *prima facie* showing of the facts on which jurisdiction to predicated.  *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).  To decide whether a *prima facie* case exists, the Court must accept as true Jacobs "uncontroverted allegations, and resolve in [its] favor, all conflicts between the facts contained in the parties' affidavits and other documentation."  *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854 (5th Cir. 2000)(quoting *Alpine View*, 205 F.3d at 215).

Jacobs asserts that jurisdiction exists under the "stream of commerce" theory because

Weida's contacts with Texas are the result of putting its chucks into the stream of commerce with the expectation that they will be sold in Texas.  "[T]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980).  "[I]f the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the [defendant] to serve, directly or indirectly, the market for its product . . . it is not unreasonable to subject it to suit."  *Id.* at 297.

Since *World-Wide Volkswagen*, the lower courts have split over the exact requirements of the stream of commerce theory.  This split is reflected in the Supreme Court's opinion in *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1987).  In *Asahi*, the plaintiff asserted the jurisdiction of California state court was proper for the purpose of requiring a Japanese corporation to indemnify a Taiwanese corporation on the basis of a sale made in Taiwan and a shipment of goods from Japan to Taiwan.  All of the justices agreed that jurisdiction did not lie in California and that the stream of commerce theory provided a valid basis for determining minimum contacts.  The justices, however, could not agree as to the exact requirements of an application of the theory.  Four justices, led by Justice O'Conner, expressed that an exercise of personal jurisdiction required more than the mere act of placing a product in the stream of commerce, but there must be in addition "an action of the defendant purposefully directed toward the forum State."  *Asahi*, 480 U.S. at 112.  The O'Conner plurality's view has become known as the "stream of commerce plus" theory.  Four other justices, led by Justice Brennan, did not believe that the showing of additional conduct was necessary.  The Brennan plurality held that:

6

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity.

*Id.* at 117.

The Federal Circuit adopted and applied the stream of commerce theory in *Beverly Hills Fan Co.*, 21 F.3d at 1566. However, with respect to deciding whether to apply the O'Conner or Brennan version of the stream of commerce theory, the Federal Circuit declined to choose and stated: "We need not join this debate here, since we find that, under either version of the stream of commerce theory, plaintiff made the required jurisdictional showing." *Id.* The Fifth Circuit, on the other hand, follows the pre-*Asahi* cases which apply the standard stream of commerce theory. *Ham v. La Cienega Music Co.*, 4 F.3d 413, 416 n.11 (5th Cir. 1993) ("Absent rejection by a majority of the Supreme Court, we have continued to apply the stream of commerce analysis found in our pre-*Asahi* cases."). In the absence of Federal Circuit guidance, this Court must follow Fifth Circuit precedent. *Panduit Corp.*, 744 F.2d at 1574-75.

B.    Minimum Contacts Analysis

Weida argues that it does not have any contacts with the State of Texas and is thus not subject to the personal jurisdiction of this Court. In support of its Motion to Dismiss, Weida submits the Declaration of Yang Gui-Jun (hereinafter "Gui-Jun"), the Vice-General Manager for Weida. Gui-Jun declares:

> Weida does not sell products in the State of Texas. Weida has no officers, employees, distributors, manufacturing facilities, offices or assets in Texas.

Weida does not own property in Texas.  Weida is not registered to do business in Texas.  Weida does not pay taxes to the State of Texas.  Weida does not maintain a registered agent in Texas.  Weida does not have established product distribution channels in Texas.  Nor does Weida extend product warranties to Texas consumers.

Declaration of Yang Gui-Jun at 1.

Gui-Jun also declares "Weida does not make, use, import, offer for sale and/or sell the accused chucks in Texas or anywhere else in the United States." *Id.* at 2.  Weida asserts that to the extent chucks manufactured by Weida found their way into Texas, it was not the result of any activity of Weida purposefully directed at Texas.  Instead, Weida asserts that the presence of the accused chucks in Texas was the result of a unilateral decision by companies wholly unrelated to Weida.

Jacobs argues that Weida is subject to specific jurisdiction in Texas because Weida purposefully directs the sale of the alleged infringing drill chucks towards the United States and Texas through the distribution channel flowing from Weida to The Home Depot stores.  According to Jacobs, Weida is the first link in a distribution chain that knowingly delivers the alleged infringing drill chuck to the final destination The Home Depot stores in the Untied States and Texas.  In support of its argument, Jacobs attaches a picture of the alleged infringing chuck and claims the chuck is specifically marked in China with the RIDGID brand name.  *See* Plaintiff's Memorandum in Opposition to Defendant Shandong Weida Machinery Co. Ltd.'s Motion to Dismiss, Tab K.  Jacobs also emphasizes that according to Home Depot's 10-K Form filed with the United States Securities and Exchange Commission, RIDGID brand power tools are sold exclusively at The Home Depot Stores.  *See* The Home Depot, Inc., Form 10-K (Annual Report), Filed 4/11/2005 For Period Ending 1/30/2005, *available at* http://www.shareholder.com/Common/Edgar/354950/1047469-05-9783/05-00.pdf (last visited

Nov. 30, 2005).

Weida's argument that it is not subject to personal jurisdiction in Texas because the presence of the accused chucks in Texas was the result of a unilateral decision by companies wholly unrelated to Weida is unpersuasive.  Based upon the evidence presented to this Court, it is reasonably inferable that Weida knew and expected its chucks would be used as components in RIDGID brand drills manufactured and distributed by Techtronic and One World to The Home Depot stores in the United States, including Texas.  Techtronic and its wholly owned subsidiary One World are well known as the manufacturers of RIDGID brand power tools.  *See* RIDGID® Power Tools Sets New Industry Standard TTI Adds Three-Year Full Service Warranty, http://www.ttigroup.com/fileLibrary/R040610.pdf (last visited Nov. 30, 2005).  Weida admits it contracted to sell the alleged infringing chucks to Techtronic and granted Techtronic the exclusive right to sell the chucks in the United States.  As previously mentioned, the alleged infringing chucks are marked with the RIDGID brand name when manufactured and RIDGID brand power tools are known to be sold at The Home Depot stores.  *See id.*; The Home Depot, Inc., *supra*.  The Home Depot at the end of its Fiscal 2004 (January 30, 2005) was the world's largest home improvement retailer and operated 1657 stores in the United States, including 153 in the State of Texas.  *See* The Home Depot, Inc., *supra*.  As the world's largest manufacturer of drill chucks, it is not unreasonable to infer that Weida knew and expected that the chucks sold to Techtronic would be sent to the United States in RIDGID brand drills for sale at The Home Depot stores, including those in Texas.[6]

_____

[6]Weida manufacturers fifty million pieces of chucks annually for sale to customers in eighty different countries.  The chucks are sold in 150 varieties within four main catagories. Weida is a sophisticated company that holds forty-eight patents in China and two in the United

Weida asserts that *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), *Red Wing Shoe Co. v. Hocherson-Halberstadt, Inc.*, 148 F.3d 1355 (Fed. Cir. 1998), and *Adell Corp. v. Elco Textron, Inc.*, 51 F. Supp. 2d 752 (N.D. Tex. 1999) are relevant precedent to the present case and support Weida's contention that this Court lacks personal jurisdiction.  In *World-Wide Volkswagen Corp.*, the Supreme Court held that the State of Oklahoma could not exercise personal jurisdiction over a New York automobile distributorship (World-Wide Volkswagen Corp.) that sold an automobile in New York to New York residents.  The New York residents traveled to Oklahoma in the automobile, where they were involved in an accident.  World-Wide Volkswagen Corp. did not conduct sales, perform services, engage in advertising, or seek to serve the Oklahoma market.  The Supreme Court emphasized that "mere unilateral activity" of a third party cannot satisfy the requirement of minimum contacts with the forum State, despite foreseeability of the third party's actions.  *World-Wide Volkswagen Corp.*, 444 U.S. at 298.  According to the Supreme Court, if foreseeability was the criterion for personal jurisdiction, "[e]very seller of chattels would in effect appoint the chattel his agent for service of process.  His amenability to suit would travel with the chattel." *Id.* at 296.  Weida argues that *World-Wide Volkswagen* is applicable in the present case because Weida's chucks are sold in Texas through the unilateral actions of third-parties over whom Weida has no control.

In *Red Wing Shoe Co.*, the Federal Circuit held that a Minnesota court could not exercise personal jurisdiction over Hocherson-Halberstadt, Inc. ("HHI"), a Louisiana corporation whose principal place of business was in New Mexico.   HHI was a licensor and enforcer of rights associated with two athletic shoe patents.  Red Wing Shoe Co. ("Red Wing") filed a declaratory

States, with five awaiting approval. *See* Shandong Weida Machinery Co., Ltd., *supra*.

judgment action against HHI in the District of Minnesota alleging noninfringement, invalidity, and unenforceability of one of the patents licensed by HHI after HHI accused Red Wing of infringement.  Red Wing was a Minnesota corporation with its principal place of business in Minnesota.  Red Wing argued that HHI was subject to personal jurisdiction in Minnesota because HHI had thirty-four licensees who sold products in Minnesota.  HHI, however, did not manufacture and sell athletic shoes or any other product in Minnesota or other states.  The Federal Circuit stated that "doing business with a company that does business in Minnesota is not the same as doing business in Minnesota." *Red Wing Shoe Co.*, 148 F.3d at 1362.  While Red Wing attempted to describe HHI's licensees as a "distribution channel" that placed products in the stream of commerce, the Federal Circuit stated that HHI's product was a covenant not to sue and thus was not a product that entered the stream of commerce. *Id.*  The Federal Circuit also emphasized that the licensees were not HHI's agents and that HHI did not have control over their activities.  Weida argues that *Red Wing Shoe Co.* is applicable because Weida in effect only does business with a company (Techtronic) that does business with another company (One World), which in turn does business with a company (The Home Depot) that does business in Texas.

In *Adell Corp.*, the court held that Elco, a Delaware corporation headquartered in Illinois who manufactured parts for automotive and commercial equipment manufacturers, was not subject to personal jurisdiction in Texas for allegedly infringing a patent for a locking device on spare tires that are stored under the beds of certain pickup trucks.  Elco developed and made components for General Motors to use in its spare tire theft deterrent system on a certain pickup truck model.  Adell alleged Elco intentionally made and shipped the infringing products to General Motors with the expectation that they would be used in pickup trucks shipped to and

sold in Texas.  The court determined that Elco did not ship its components to an established

intermediary who then sold the device in Texas.  Instead, the court determined that General

Motors combined the components made by Elco with components made by other manufacturers

to form its own product, a spare tire locking device.  The court also determined that Elco did not

have an established distribution channel to indirectly sell the component in Texas.  Therefore, the

court held that Elco did not have purposeful minimum contacts with Texas based on the stream

of commerce theory.  *Adell Corp.*, 51 F. Supp. 2d at 754-55.  Weida argues that *Adell* is

applicable because Weida also sold an allegedly infringing component to a third party outside the

borders of Texas who then combined the component into a retail product and shipped the product

to Texas.

      *World-Wide Volkswagen Corp.* and *Red Wing Shoe Co., Inc.*, are distinguishable from the

present case and therefore are not controlling.  In *World-Wide Volkswagen*, the plaintiffs argued

that because an automobile was mobile, it was foreseeable by the Volkswagen distributor that its

products would travel to states such as Oklahoma and be involved in accidents there.  The

Supreme Court rejected this argument, stating that "'foreseeability' alone has never been a

sufficient benchmark for personal jurisdiction under the Due Process Clause."  *World-Wide*

*Volkswagen Corp.*, 444 U.S. at 295.  However, the Supreme Court later in its opinion stated that

foreseeability was not irrelevant when "a corporation that delivers its products into the stream of

commerce with the expectation that they will be purchased by consumers in the forum State."  *Id.*

at 298.  In the present case, the uncontroverted fact that Weida marks the alleged infringing

chucks with the brand name RIDGID and that RIDGID products are sold exclusively at The

Home Depot stores is evidence that Weida placed the chucks in the stream of commerce with the

expectation that they would be purchased by consumers at The Home Depot stores in the United States, including Texas.

*Red Wing Shoe Co., Inc.*, is distinguishable because the alleged minimum contacts were patent licenses between HHI and various Minnesota companies, not the placement of a manufactured good in the stream of the commerce as in the present case.   In the present case, Weida placed an alleged infringing chuck in the stream of commerce with the expectation that it would be purchased by consumers at Home Depot stores.  Therefore, Weida's chucks did not come to Texas through "the unilateral activity of another party or third person," *Red Wing Shoe Co., Inc.*, 148 F.3d at 1361 (quoting *Burger King Corp.*, 471 U.S. at  475), but instead with Weida's expectation that they would be purchased at The Home Depot.

This Court also does not find *Adell Corp.* persuasive and instead agrees with the reasoning in cases from the Western District of Michigan, *Donnelly Corp. v. Reitter & Schefenacker GmbH & Co. KG*, 189 F. Supp. 2d 696 (W.D. Mich. 2002), and the District of Delaware, *Motorola, Inc. v. PC-Tel, Inc.*, 58 F. Supp. 2d 349 (D. Del. 1999).  In *Donnelly*, the owner of three patents on automobile rear view mirrors sued a German mirror manufacturer for infringement.  The German manufacturer did not sell its rear view mirrors in the United States, but instead sold rear view mirrors to Mercedes in Germany for car destined for the United States.  In rejecting the German manufacturer's argument that it lacked minimum contacts with the State of Michigan, the district court stated the accused rear view mirror "landed in Michigan through 'the regular and anticipated flow of products.'"  *Id.* at 708 (quoting *Asahi*, 480 U.S. at 117).  The district court further stated that while the accused product came to Michigan by way of a company (Mercedes) not controlled by the defendant, such a practice was "no different from

13

using a distributor to market a product in the United States and intending that the products land

there.  Defendant R & S GmbH had to expect suits in the United States arising out of its sale of

the mirrors, given that it directed the mirrors to American markets . . . ."  *Id.*

In *Motorola*, the plaintiff sued PC-Tel, Inc., and AltoCom for allegedly infringing a

patent for software modem technology (softmodems).  AltoCom argued that the Delaware court

did not have personal jurisdiction because AltoCom did not have any direct contact with

Delaware.  Specifically, AltoCom stated that it did not ship any softmodems directly to

Delaware, nor did it advertise, conduct any business, or maintain any assets in Delaware.  The

court found, however, that AltoCom's softmodems were integrated into a variety of consumer

electronic products which were manufactured by well-known multi-national corporations such as

Compaq, Phillips, Samsung, Sharp, Sony, and others.  These goods were then put into

world-wide distribution networks which placed them for sale in equally well-known retail stores

such as Caldor, Circuit City, CompUSA, Office-Max, Sears, Service Merchandise, and others–all

which had outlets in Delaware.  These products were advertised extensively nationwide and in

Delaware through various sources such as newspapers of general circulation, magazines directed

at retail consumers of electronic products, and other types of catalogs.  Based upon these

findings, the court held:

> the plaintiff has stated all of the necessary ingredients for an exercise of
> jurisdiction consonant with due process:  defendants, acting in consort, placed the
> accused fan in the stream of commerce, they knew the likely destination of the
> products, and their conduct and connections with the forum state were such that
> they should reasonably have anticipated being brought into court there.

*Motorola, Inc.*, 58 F. Supp. 2d at 355.

The present case is similar to *Donnelly* and *Motorola*.  As in *Donnelly*, Weida

manufactures an alleged infringing component part obviously designed and intended for sale in the United States.  The fact that Weida, like the defendant in *Donnelly*, does not control where downstream manufacturers sell products containing the alleged infringing part is of no consequence because Weida should reasonably expect drills containing the chuck will be sold in the United States and Texas.

As in *Motorola*, Weida knew its alleged infringing chuck was to be integrated into a popular brand of consumer goods destined to be sold by a well-known and large retailer in the United States.  Weida also was undoubtedly aware of The Home Depot's extensive advertising efforts, including efforts related to RIDGID products and the model R7000 drill.  Therefore, it is reasonable for this Court to conclude that Weida expected and knew that RIDGID brand R7000 drills containing the alleged infringing chucks would be bought by consumers in the United States and Texas.

C.    Fair Play and Substantial Justice

"[O]nce a plaintiff makes the required showing that there have been sufficient minimum contacts by the out-of-state defendant with the forum State, the defendant may still defeat jurisdiction by marshaling a compelling case against jurisdiction on the grounds that its exercise would be unreasonable, contrary to concepts of fair play and substantial justice."  *Viam Corp. v. Iowa Exp.-Imp. Trading Co.*, 84 F.3d 424, 429 (Fed. Cir. 1996).  The test of unreasonableness includes a balancing of (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the interest of the states in furthering their social policies.  *Id.*

15

Although there may be some burden on Weida to travel from China to Texas to litigate this case, "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *World-Wide Volkswagen Corp.*, 444 U.S. at 294 (quoting *Hanson,* 357 U.S. at 251).  Even in 1957, the Supreme Court recognized that:

> a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents.  In part this is attributable to the fundamental transformation of our national economy over the years.  Today many commercial transactions touch two or more States and may involve parties separated by the full continent.  With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines.  At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.

*McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222-23 (1957).

Since 1957, dramatic advances in transportation and communication technology have only further lessened the burden on foreign defendants, such as daily international commercial flights, express delivery services, fax machines, the Internet, teleconferencing, and videoconferencing.  The same technology that facilitates Weida conducting business with customers in eighty countries equally facilitates its ability to defend itself from claims of patent infringement in countries where its products arrive.

It is worth noting that "[s]uch defeats of otherwise constitutional personal jurisdiction 'are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum.'" *Akro,* 45 F.3d at 1549 (quoting *Beverly Hills Fan Co.*, 21 F.3d at 1568).  The Court does not believe this is one of those rare situations.  Texas has a significant interest in discouraging injuries, including those arising

16

from patent infringement, that occur within the state.  *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984); *Cummins-Allison Corp. v. Glory Ltd.*, No. 2:03-CV-385TJW, 2004 WL 1635534, *5 (E.D. Tex. May 26, 2004).  Jacobs also has a significant interest in litigating the case in Texas because it potentially suffers economic loss in Texas through the sale of the RIDGID Model No. R7000 drill containing the alleged infringing chuck.  *See Beverly Hills Fan Co.*, 21 F.3d at 1571 ("Economic loss occurs to the patent holder at the place where the infringing sale is made because the patent owner loses business there.").  Finally, Texas has a definite and well-defined interest in commerce and scientific development, particularly given the breadth and depth of the technology sector in Texas.  *Viam Corp.*, 84 F.3d at 430.

## IV.    Conclusion

After considering the parties' briefs and the evidence they presented, this Court DENIES Weida's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) For Lack of Personal Jurisdiction.  This Court finds that minimum contacts exist between Weida and Texas because Weida delivered the alleged infringing chuck into the stream of commerce with the expectation that it would be purchased by consumers in the United States and Texas as part of the RIDGID brand R7000 drill.  This Court also finds jurisdiction over Weida would not violate the concepts of fair play and substantial justice found in our judicial system.

SIGNED this  5th  day of December, 2005.

_T. John Ward_

_____

T. JOHN WARD
UNITED STATES DISTRICT JUDGE